IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JACKSON, KEY PRACTICE SOLUTIONS, L.L.C.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 15-0483-WS-B |
| ) | |
| **KATHERINE J. SULLIVAN,** ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss and Alternative Motion to Transfer Venue (doc. 6). The Motion has been exhaustively briefed (including a pair of sur-replies filed with leave of court) and is now ripe for disposition.[1]

**I.     Relevant Background.**

Notwithstanding the heft and tenor of the parties' briefing, the relevant facts and circumstances bearing on the pending Motion are largely uncontested. Plaintiff, Jackson, Key Practice Solutions, L.L.C. ("Jackson Key"), an Alabama limited liability company with its principal place of business in Mobile County, Alabama, brought this action against defendant, Katherine J. Sullivan, an individual who resides in Los Angeles County, California, in Mobile County Circuit Court on August 26, 2015. Sullivan subsequently removed the case to this District Court, predicating federal jurisdiction on the diversity provisions of 28 U.S.C. § 1332.

Jackson Key alleges in its pleading that "Defendant's employee, for and on behalf of Defendant, reached out to Plaintiff in the State of Alabama for the purpose of purchasing from Plaintiff certain medical billing software … and other services provided by the Plaintiff,

---
[1]     The Court notes at the outset that movant's Reply (doc. 13) exceeds without leave the 15-page limitation prescribed by the Local Rules, and is therefore subject to being stricken. *See* Civil L.R. 7(e). In its discretion, however, the Court will consider the Reply in its present form to avoid the additional delay and expense that would result from striking the Reply and ordering re-briefing.

including ongoing troubleshooting services." (Doc. 1, Exh. A, ¶ 7.) This medical billing software is known as the "Aprima software." According to the Complaint, the transaction was finalized when Jackson Key and Sullivan executed a Subscription Agreement bearing the effective date of March 12, 2015. (*Id.*, ¶ 8.) Relevant terms of that Agreement, as pleaded in the Complaint, were that "in exchange for the sale of the Aprima software and the ongoing services to be provided by Plaintiff, Defendant agreed to pay the Plaintiff an installation fee of $1,450.00. Defendant further agreed to pay to Plaintiff the sum of $1,671.52 per month over sixty (60) months." (*Id.*, ¶ 9.) Jackson Key alleges that, after paying the installation fee and four monthly installments, Sullivan refused to make any additional required payments, leaving an outstanding balance of $93,605.12 for the Aprima software she had purchased from Jackson Key. (*Id.*, ¶¶ 9-10.) On that basis, Jackson Key brings a single cause of action against Sullivan, alleging that "Defendant has breached the parties' contract by failing to make the regular installment payments and also by indicating that the Defendant has no intention of making any further installment payments to Plaintiff." (*Id.*, ¶ 16.)

The Subscription Agreement is a barebones, two-page, preprinted, boilerplate document, accompanied by a one-page exhibit labeled "Quote." (Sullivan Aff. (doc. 6, Exh. A), at ¶ 68 & Exh. 1.) That Agreement specifies as follows: (i) Jackson Key "is in the business of providing computer software, hosting and maintenance services for" Sullivan; (ii) Jackson Key agreed to provide to Sullivan "the software and/or services as detailed in" the Quote; (iii) the Agreement had a 60-month term, and would be "automatically renewed in 12 month increments unless given 45 days notice of cancellation;" (iv) the Agreement "shall be governed by and shall be construed and enforced in accordance with the laws of the State of Alabama;" and (v) the Quote identified certain Aprima software licenses that Jackson Key would provide to Sullivan, with the tag "includes maintenance" for each, plus "setup and training" for a "Practice Portal," as well as certain hardware that "includes maintenance," with monthly fees totaling $1,671.52 for the life of the Agreement. (Sullivan Aff., Exh. 1.) Despite defendant's arguments to the contrary, the Subscription Agreement unambiguously reflects that it was entered into between Jackson Key and Sullivan (rather than one of her companies). Indeed, "Katherine Sullivan" is defined as the "CLIENT" on both pages of the Agreement, which specifies that "CLIENT and JKPS have entered into this Agreement." (*Id.*) The Subscription Agreement lacks a venue provision or a forum-selection clause.

The Complaint does not allege that Sullivan ever traveled to Alabama. Rather, the jurisdictional facts identified in the pleading are that one of Sullivan's employees, acting on her behalf, "affirmatively reached out to Plaintiff to inquire about the service contract;" that Jackson Key did not solicit Sullivan's business; that "[t]he execution of the service contract created an ongoing business relationship between Plaintiff and Defendant;" and that the Subscription Agreement is governed by Alabama law. (Doc. 1, Exh. A, ¶ 5.) By affidavit, Sullivan avers that the employee in question (Cheryl Taylor) was actually employed by one of Sullivan's companies, not by Sullivan herself; that Sullivan never personally contacted or had discussions with Jackson Key prior to execution of the Subscription Agreement; that Sullivan signed the Subscription Agreement in California on Taylor's recommendation; that Sullivan authorized a recurring bank draft from a corporate bank account in California to pay Jackson Key in monthly installments; that Sullivan subsequently exchanged emails with Jackson Key on one occasion, participated in one telephone conference with Jackson Key, and left one voicemail for Jackson Key; and that Sullivan had no other business activities or relationship with Jackson Key. (Sullivan Aff., ¶¶ 64-68, 72, 79, 83.)

A rebuttal affidavit from Jackson Key's owner (Watt Key) confirms that Taylor approached Jackson Key on Sullivan's behalf to inquire about the subject software, that Sullivan did not negotiate with Jackson Key concerning the Subscription Agreement, that the Agreement did not make allowances for Jackson Key to furnish training to Sullivan or her staff, that Jackson Key nonetheless "stood ready to provide initial troubleshooting assistance" to Sullivan "should the need arise," that Jackson Key believed "this was the beginning of an ongoing relationship" with Sullivan, that Sullivan contacted Jackson Key about purchasing training services on July 2, 2015, that a three-way conference call involving Sullivan, Jackson Key and the software maker occurred that day, that Sullivan did not return or respond to Jackson Key's numerous e-mails and telephone calls thereafter, and that Jackson Key had no further contact with Sullivan until after suit was filed. (Key Aff. (doc. 10, Exh. A), ¶¶ 7-9, 12, 13.) Defendant has also submitted an affidavit from Cheryl Taylor, reflecting that she worked for one of Sullivan's companies during the relevant time period, that she discussed Jackson Key with Sullivan, that she referred Sullivan to Jackson Key, that Sullivan was aware that Jackson Key was based in Alabama, that Taylor contacted Jackson Key regarding the purchase of software for Sullivan's clinic at Sullivan's

direction, and that Taylor (not Jackson Key) was to provide implementation and training for the Aprima software at Sullivan's business.  (Taylor Aff. (doc. 10, Exh. B), ¶¶ 5-6, 9, 16.)

Defendant posits that personal jurisdiction over her is lacking in the State of Alabama and that this action must therefore be dismissed.  Alternatively, defendant seeks a transfer of this action to the U.S. District Court for the Central District of California, Western Division, on grounds of convenience of parties and witnesses, in the interest of justice, pursuant to 28 U.S.C. § 1404(a).  Plaintiff opposes both components of the Motion.

**II.     Personal Jurisdiction Issue.**

   ***A.     Legal Standard / Burden of Proof.***

As noted, Sullivan requests dismissal of the Complaint pursuant to Rule 12(b)(2), Fed.R.Civ.P., for lack of personal jurisdiction.  The burden of proof on a personal jurisdiction challenge is well-settled.  Specifically, "[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction."  *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citations omitted); *see also Hard Candy, LLC v. Hard Candy Fitness, LLC*, --- F. Supp.3d ----, 2015 WL 3377906, *4 (S.D. Fla. May 13, 2015) ("Initially, a plaintiff seeking to establish a court's jurisdiction over a non-resident defendant need only allege sufficient material facts to make out a *prima facie* case of jurisdiction.").  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Mazer*, 556 F.3d at 1274. (citations and internal quotation marks omitted).  "A *prima facie* case is established if the plaintiff presents affidavits or deposition testimony sufficient to defeat a motion for judgment as a matter of law."  *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010).

"Where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff. … If such inferences are sufficient to defeat a motion for judgment as a matter of law, the court must rule for the plaintiff, finding that jurisdiction exists." *PVC Windoors*, 598 F.3d at 810 (citation, internal marks and footnote omitted); *see also Hard Candy*, 2015 WL 3377906, at *4 ("In assessing the evidence, the court must construe all reasonable inferences in favor of the plaintiff.") (citation and internal quotation marks omitted).  Notwithstanding the burden-shifting

framework identified herein, "[i]t goes without saying that, where the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).

The Subscription Agreement did not contain a forum-selection clause through which defendant might have expressly consented to personal jurisdiction in Alabama.[2]  Absent such an express contract provision, when faced with a Rule 12(b)(2) motion "the plaintiff has the twin burdens of establishing that personal jurisdiction over the defendant comports with (1) the forum state's long-arm provision and (2) the requirements of the due-process clause of the Fourteenth Amendment." *Continental Motors, Inc. v. Jewell Aircraft, Inc.*, 882 F. Supp.2d 1296, 1306 (S.D. Ala. 2012) (citation omitted).  "In this case, the two inquiries merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Industries Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007).  Thus, the operative query is whether the exercise of personal jurisdiction over Sullivan in Alabama comports with the guarantees of due process.

The particulars of the constitutional analysis depend on whether the type of personal jurisdiction asserted in a particular case is "general" or "specific."  Indeed, facts supporting personal jurisdiction "may be general, which arise from the party's contacts with the forum state that are unrelated to the claim, or specific, which arise from the party's contacts with the forum state that are related to the claim." *Continental Motors*, 882 F. Supp.2d at 1307 (citation omitted).  Jackson Key proceeds solely on a <u>specific</u> jurisdiction theory with respect to Sullivan; therefore, the Court will not perform a general jurisdiction analysis, even though defendant has briefed that issue at length.

---

[2]  Had such a clause been present, the personal jurisdiction analysis would have been streamlined, inasmuch as courts routinely uphold and enforce those types of provisions. *See, e.g., Continental Motors, Inc. v. Jewell Aircraft, Inc.*, 882 F. Supp.2d 1296, 1303 (S.D. Ala. 2012) ("In that same clause, JA consented to personal jurisdiction in Alabama.  Such forum-selection clauses are routinely upheld as valid and enforceable."); *Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So.2d 1129, 1132 (Ala. 2003) (describing "well-established law of Alabama that forum-selection clauses will be enforced so long as they are not unfair or unreasonable under the circumstances").

"Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum." *PVC Windoors*, 598 F.3d at 808 (citation and internal quotation marks omitted). "In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum's state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citations omitted). The plaintiff bears the burden of establishing each of the first two prongs, after which the defendant / movant must make a "compelling case" that exercising jurisdiction would violate traditional notions of fair play and substantial justice. *Id.*

### B. Plaintiff Fails the Second Prong of the Specific Jurisdiction Analysis.

The critical aspect of the "specific jurisdiction" analysis in this case concerns the second prong, to-wit: Whether Sullivan purposefully availed herself of the privilege of conducting activities within Alabama, thus invoking the benefit of Alabama's laws.[3]

Sullivan's principal contact with the State of Alabama was that she entered into a contract (the Subscription Agreement) with an Alabama-based company, Jackson Key. However, "it is settled that entering a contract with a citizen of another state, standing alone, does not

---

[3] Defendant's argument concerning the first prong of the "specific jurisdiction" test does not withstand even modest scrutiny. Of course, "[a] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." *Louis Vuitton*, 736 F.3d at 1355 (citations omitted). Defendant insists that "Sullivan's Contacts with the Forum State are not Related Nor Give Rise to the Plaintiff's Cause of Action." (Doc. 6-1, at 12.) This is obviously wrong. Jackson Key's breach of contract claim plainly arises out of Sullivan's contacts with Alabama (*i.e.*, her entering into a contract with an Alabama company, her email and telephonic contacts with that Alabama company, her refusal to pay that Alabama company for goods and services provided, her termination of authorization for that Alabama company to debit her corporate bank account automatically each month for the subject software, etc.). Sullivan's ties to Alabama all involve the solicitation, execution, implementation and cancellation of the contract with Jackson Key, which are the precise events giving rise to this lawsuit. Thus, the "arising out of" / "relatedness" prong is unquestionably satisfied here, notwithstanding defendant's strained assertions to the contrary.

automatically satisfy the minimum contacts test." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1268 (11th Cir. 2010); *see also PVC Windoors*, 598 F.3d at 811 ("a contract with an out-of-state corporation, standing alone, is insufficient to create minimum contacts"). "Rather, when inspecting a contractual relationship for minimum contacts, we follow a 'highly realistic approach' that focuses on the substance of the transaction: prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing." *Diamond Crystal*, 593 F.3d at 1268. "The focus must always be on the *nonresident defendant's* conduct, that is, whether the defendant deliberately engaged in significant activities within a state or created continuing obligations with residents of the forum." *Id.* This "purposeful availment" analysis of Sullivan's contacts with Alabama is "immune to solution by checklist;" rather, her "contacts must be viewed both quantitatively and qualitatively." *Sloss Industries*, 488 F.3d at 925 (citation omitted).

Although merely entering into a contract with an Alabama business does not qualify as purposeful availment, Sullivan may be subject to personal jurisdiction in Alabama "where further contacts or plus factors connect the defendant to the jurisdiction." *Diamond Crystal*, 593 F.3d at 1268 (reciting non-exhaustive list of such considerations as being whether defendant initiated contractual relationship, visited plaintiff's factory, sent materials to plaintiff, participated in manufacturing process, established relationship by placing multiple orders, required performance in the forum, negotiated contract via faxes or calls with plaintiff, and so on). The appropriate inquiry, then, is to scrutinize Sullivan's entire course of conduct with respect to the Jackson Key transaction for those "further contacts" or "plus factors" in order to reach a determination of whether her contractual relationship with Jackson Key gives rise to minimum contacts in Alabama.

Engaging in such a "highly realistic approach" that focuses on the substance of the transaction, it is readily apparent that (i) Sullivan's conduct involved precious few interactions with Alabama, and (ii) what interactions she did have with Alabama were largely insubstantial. Plaintiff's evidence shows that Sullivan authorized Cheryl Taylor, an employee of one of her businesses, to approach Jackson Key about purchasing the Aprima software. Thus, Sullivan solicited Jackson Key (albeit indirectly), not the other way around. However, there were no prior negotiations between Sullivan and Jackson Key; rather, Sullivan simply signed the contract proposed by Jackson Key, as well as an authorization for Jackson Key to debit her corporate

bank account for monthly installment payments on an ongoing basis. (Sullivan Aff., Exh. 1 & 2.) Neither Sullivan nor any of her agents or employees ever traveled to Alabama to visit Jackson Key's offices, participate in software demonstrations, meet or negotiate with company officials, or the like. Even Sullivan's telephonic and email contacts with Jackson Key were minimal, in terms of both substance and frequency. Indeed, the sum total of Sullivan's direct communications with Jackson Key in Alabama between the initial inquiry by Taylor and the filing of the Complaint in this litigation consisted of a brief exchange of emails between Sullivan in California and Jackson Key in Alabama in July 2015 (doc. 10, Exh. C); a single telephone conference involving Sullivan, Jackson Key, and the software developer (Sullivan Aff., ¶ 79); and a single telephone voice mail left by Sullivan to Jackson Key (*id.*). There were no other transactions, negotiations or dealings between Sullivan and Jackson Key. The actual course of dealing, then, reflects that Sullivan engaged in almost no activities directed at Alabama residents prior to or during the lifespan of the Subscription Agreement.

With respect to the terms of the contract and the contemplated future consequences of entering into the Subscription Agreement, courts routinely distinguish between a one-shot operation (which does not and cannot give rise to the requisite minimum contacts) and a substantial ongoing business relationship (which can).[4] Indeed, the law is clear that "a mere one-time purchaser of goods from a seller in the forum state cannot be constitutionally subject to the exercise of personal jurisdiction by the courts of the forum state." *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1059 (11th Cir. 1986). By contrast, in the case of interstate contractual obligations, "parties who reach out beyond one state and ***create continuing***

---

[4]   *Compare PVC Windoors*, 598 F.3d at 812 (minimum contacts lacking where nonresident defendant entered into "one-time arrangement" with Florida corporation, agreeing to serve as surety for projects in Saint Maarten, but there was no evidence of significant negotiations of important contract terms in Florida, and merely agreeing with Florida corporation to cure any breach by third party did not evince intent to create a substantial and continuing relationship with Florida) *with Sloss Industries*, 488 F.3d at 933 (exercise of specific jurisdiction appropriate where defendant placed ten unsolicited orders with Alabama company over a period of months, had its agent send shipping containers to Alabama company, had employees visit Alabama company's plant, and sent product sample to Alabama company) *and Diamond Crystal*, 593 F.3d at 1273-74 (purposeful availment established where defendant had substantial, ongoing relationship with Georgia manufacturer, engaging in 14 transactions spanning six months, and where defendant sent unsolicited purchase orders to Georgia manufacturer for customers to pick up in Georgia).

***relationships and obligations*** with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis added and citations and internal quotation marks omitted). Not surprisingly, Sullivan characterizes the Subscription Agreement as the former, while Jackson Key frames it in terms of the latter.

Sullivan has the better argument. The essential terms of the contract were that Jackson Key furnished certain Aprima software licenses to Sullivan, in exchange for which Sullivan agreed to make monthly installment payments over a period of 60 months. The Subscription Agreement did not expressly provide for any training or other services to be provided by Jackson Key to Sullivan on an ongoing basis during that 60-month term. By all appearances, the deal was that Jackson Key would provide the Aprima software and that Sullivan would finance the purchase by making payments for 60 months.[5] Those installment payments, in turn, were made via one-time bank authorization by Sullivan, such that the money was to be automatically withdrawn each month from her business's bank account without Sullivan having to take any action, engage in any activity, or have any dealings, contact, discussions or correspondence with Jackson Key. By all appearances, Jackson Key would not even send Sullivan a monthly billing statement, invoice or reminder slip. Thus, based on the terms of the Subscription Agreement, the arrangement was a classic example of a "one-shot operation" (albeit one for which Sullivan would pay in installments for a period of time), with no ongoing dealings, communications or business relationship between the parties.

Notwithstanding the foregoing, Jackson Key takes the position that the Subscription Agreement was actually creating "a multi-year relationship" between the parties, not only because of Sullivan's continuing payment obligations to Jackson Key but also because Jackson Key would "serve as a liaison between Dr. Sullivan and Aprima [the software developer] during

---

[5] Jackson Key's evidentiary submission confirms this basic structure of the agreement. *See* Key Aff., ¶ 6 ("The client can purchase the third-party software from JKPS outright (which typically costs about $20,000.00 per physician) or the client can 'finance' the purchase of the third-party software by making payments to JKPS over a period of time, typically 60 months, according to the *Quote* agreed upon between JKPS and the physician.").

the term of the *Subscription Agreement*." (Doc. 10, at 10.)[6] The trouble with these characterizations is the lack of evidence that any such "initial troubleshooting services" or "liaison" services were a meaningful part of this deal. Certainly, they are not reflected in the terms of the Subscription Agreement.[7] There is no evidence that Sullivan desired or requested such services when the deal was struck; to the contrary, Sullivan had declined to purchase any of Jackson Key's available training packages on the theory that her in-house employee (Taylor) would handle build-out of the system as well as training of Sullivan's staff. (Key Aff., ¶ 7.)

Nor is there any evidence that Jackson Key ever communicated to Sullivan – or that Sullivan was otherwise aware – that Jackson Key was purportedly "available to provide assistance" to her in the event that "initial troubleshooting" or "liaison" services became necessary. (*Id.*, ¶ 9.) It would be counterintuitive, to say the least, to divine an "ongoing business relationship" from a business's theoretical availability to provide services of which the other party was never made aware. Furthermore, record evidence suggests that these "troubleshooting" and "liaison" services were, as a practical matter, insubstantial. When

---

[6] Jackson Key elaborates in its evidentiary submission by explaining that, where a client elects to make installment payments, Jackson Key "will provide initial troubleshooting services to the client during the period of time that the client is paying for the third-party software (e.g. 60 months). JKPS will attempt to resolve any question that the client may have regarding the use of the software; if JKPS is not capable of answering the client's question, then JKPS will act as a liaison between the client and the third-party software manufacturer to ensure that the client is directed to the proper manufacturer representative for direct assistance. This creates an ongoing business relationship …." (Key Aff., ¶ 6.)

[7] To be sure, the "Quote" appended to the Agreement reflects that the prices for the various Aprima software licenses being provided "include[] maintenance." However, neither side offers any insight into the meaning of the term "maintenance" in this context (as distinguished from "training," which was excluded from the software and services provided), whether it was reasonably likely that any such "maintenance" of the software licenses would be necessary or appropriate during the 60-month period, or whether either side had any expectation that Jackson Key would be called upon to provide "maintenance" for the software licenses during the lifetime of the Agreement. Aside from software license "maintenance," the only other "services" described in the Quote were "access to web-based training" for certain set-up and configuration issues, "setup and training" for a "Practice Portal," and "maintenance" for certain hardware. Again, there is no indication of the substantiality of any of these "services," much less the practical, realistic likelihood of ongoing dealings between the parties during the lifespan of the Agreement as to those "services," most of which appear to relate solely to initial set-up / installation of the software.

Sullivan (through another representative of her company) posed a question about the software in July 2015 (nearly four months after executing the Subscription Agreement), Jackson Key responded, "That is a question that needs to be directed to Aprima support for a thorough answer (I am sales)." (Doc. 10, Exh. C, at 3.) If the much-ballyhooed "liaison" and "troubleshooting" services trumpeted by Jackson Key consisted of merely advising the client in the broadest, most general of terms to contact the software manufacturer's support staff because Jackson Key is merely "sales," then such services were so insubstantial as to be of negligible weight in the minimum contacts analysis.

The bottom line is this: For purposes of the "purposeful availment" prong of the minimum contacts inquiry, the Court must undertake a fact-intensive, case-specific analysis, both quantitative and qualitative, of the contacts connecting the nonresident defendant with the forum state. Here, the sum total of those contacts is as follows: (i) Sullivan caused someone on her company's staff in California to inquire of Jackson Key in Alabama (via telephone, letter or email) about certain medical billing software; (ii) Sullivan entered into a one-time transaction with Jackson Key to purchase such software on an installment basis spanning 60 months; (iii) the written contract included a provision stating that it was governed by Alabama law; (iv) Sullivan signed a written authorization for Jackson Key to debit monthly installment payments from the bank account of one of her businesses; (v) neither the written contract nor the parties contemplated that Jackson Key would provide meaningful services to Sullivan during the life of the contract, although Jackson Key was to provide unspecified "maintenance" and subjectively believed it was "available" to provide "initial troubleshooting" and "liaison" services; and (vi) during the approximately six months between the execution of the contract and the filing of the Complaint, Sullivan's direct communications with Jackson Key consisted of one email exchange, one conference call, and one voicemail message.

Factors like having an ongoing business relationship, initiating dealings with the resident party, agreeing that the forum state's law applies, and communicating with the resident party all can constitute the sort of "plus" factors that might satisfy the minimum contacts test in a contract case. The problem is that, whether considered individually or collectively, these factors are simply too weak (or nonexistent) in this case to support a determination that Sullivan deliberately engaged in significant activities within Alabama or created continuing obligations with its residents. The impact of the "initiating dealings" factor is diminished here because Sullivan took

no action <u>herself</u> to initiate discussions with Jackson Key to purchase the subject software, thereby attenuating the inference that she intentionally directed her activities to Alabama. Her direct communications with Jackson Key were so infrequent and insignificant that they are of scant value in establishing purposeful availment. The choice-of-law provision, while relevant, sheds little light in this case on the question of Sullivan's intentional, purposeful contact with Alabama because it was contained in a non-negotiated, boilerplate form agreement. And the evidence of an "ongoing business relationship" is extraordinarily weak, with the transaction bearing much more in common with the "one-time purchase" paradigm than the "ongoing business relationship" paradigm. Neither the fact of Sullivan's ongoing obligation to make installment payments (through a single continuing bank draft authorization, such that she was neither receiving bills from Jackson Key in Alabama nor mailing checks to Jackson Key in Alabama each month) nor Jackson Key's theoretical "availability" to provide certain support services are compelling evidence of an ongoing, active, continuing course of dealing/interaction between Sullivan and an Alabama company.

The Eleventh Circuit has cautioned lower courts not to perform minimum contacts analysis "by checklist." Instead, courts must focus on whether "the plus factors indicate that the defendant deliberately affiliated with the forum, … and thus should reasonably anticipate defending a suit there." *Diamond Crystal*, 593 F.3d at 1267-69 (citations and internal marks omitted). After careful consideration of all the record facts and the parties' respective legal arguments, the Court concludes that Sullivan did not deliberately affiliate with Alabama, did not purposefully avail herself of the privilege of conducting activities in Alabama, and could not reasonably anticipate defending a lawsuit in Alabama. Sullivan lives and works in California. She engaged in a one-time purchase of medical billing software from an Alabama company. She did not negotiate with Jackson Key and did not travel to Alabama at any point in relation to that software purchase. She engaged in no other transactions or activities with Jackson Key. Her pre-suit direct communications with Jackson Key were virtually nonexistent. The countervailing facts on which Jackson Key relies (*i.e.*, installment payments, availability of Jackson Key to provide troubleshooting and liaison services, Alabama choice-of-law provision, and Sullivan's company's employee soliciting Jackson Key) are inadequate, in the specific factual context of this case, to support a conclusion that Sullivan had sufficient purposeful contacts with Alabama

-13-

that the exercise of personal jurisdiction over her in this jurisdiction would comport with baseline guarantees of due process.

### III.  Conclusion.

For all of the foregoing reasons, defendant's Motion to Dismiss for Lack of Personal Jurisdiction (doc. 6) is **granted**.  This action is **dismissed without prejudice**, pursuant to Rule 12(b)(2), Fed.R.Civ.P.  A separate judgment will enter.

DONE and ORDERED this 17th day of December, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE